## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | |
|---|---|
| CARFAX, INC., | |
| Plaintiff, | |
| vs. | CIVIL ACTION NO. 19-1294 |
| PATRICK K. WILLIS COMPANY, INC., D/B/A AMERICAN RECOVERY SERVICE, | **JURY TRIAL DEMANDED** |
| Defendant. | |

## COMPLAINT

Plaintiff Carfax, Inc. ("Carfax") hereby complains and alleges of Defendant, Patrick K.

Willis Company, Inc., d/b/a American Recovery Service ("ARS"), as follows:

## NATURE OF ACTION

1.      This is an action based upon: (1) The Computer Fraud and Abuse Act, 18 U.S.C.

§ 1030; (2) the Virginia Uniform Computer Information Transactions Act, Va. Code § 59.1-

509.2, *et seq.*, (3) the Virginia Computer Crimes Act, Va. Code § 18.2 – 152.1, *et seq.*, (4)

Breach of Contract, (5) Unjust Enrichment, and (6) Trespass to Chattels.  Carfax seeks injunctive

and other equitable relief and damages, as well as punitive damages.

2.      Carfax is a data company that collects, aggregates, distributes, and sells vehicle

history information for buyers and sellers of used cars and light trucks.  Carfax collects vehicle

history information from over 112,000 third-party sources with which it has relationships, including

motor vehicle agencies, rental and fleet vehicle companies, consumer protection agencies, state

1

inspection stations, fire and police departments, manufacturers, inspection companies, service and repair facilities, among others.

3.      One of Carfax's services, the myCARFAX Service ("myCARFAX"), is intended to aid individual vehicle owners in maintaining and tracking the service records of their personal vehicles.  myCARFAX allows consumers who create a myCARFAX account to organize their vehicle's service history in one location, get reminders about upcoming service needs, locate trusted service shops, research service and repair costs, provide ratings and reviews of service shops, and be alerted to open recalls on their vehicle.

4.      The myCARFAX Terms of Use explicitly state that it may not be used for commercial purposes.  Instead, myCARFAX is intended for personal use by individual consumers.

5.      Defendant ARS, a Patrick K. Willis Company, is a recovery service provider that works to repossess vehicles from owners who have defaulted on vehicle loan payments – often referred to as a "repo" or "skip-tracing" business.

6.      Defendant has been a commercial business customer of Carfax and is therefore aware that Carfax charges fees for the commercial use of its data.

7.      The employees and/or agents of Defendant who locate vehicles were once referred to as "repo" men and are now referred to as "skip tracers."  When a vehicle owner fails to make payments on an auto loan, John Doe[1] lenders and loan holders hire Defendant to locate and/or recover the vehicle.  The same process may be undertaken when a car is stolen.  The process of locating the vehicle for repossession centers around obtaining vehicle location information.  This makes vehicle location data highly valuable in the vehicle repossession industry.

---

[1] Carfax intends to discover the identities of Defendant's John Doe customers and/or clients and reserves the right to amend its complaint to include the John Doe customers and/or clients as defendants, as necessary.

8.      Numerous employees and/or agents of Defendant have engaged in a knowing and intentional scheme to use myCARFAX, in violation of the myCARFAX Terms of Use, for commercial purposes.  They repeatedly, knowingly, and without authorization steal Carfax data and then, in turn, use the stolen Carfax data in order to track down stolen or missing vehicles. Specifically, employees and/or agents of Defendant create fictitious and/or deceptive myCARFAX profiles and pose as the owner of a vehicle they are attempting to repossess in order to attempt to locate the vehicle by viewing the location of recent services performed on the vehicle.

9.      More than 30 employees and/or agents of Defendant have registered multiple fictitious and/or deceptive profiles and used myCARFAX to wrongfully access the data for at least 5,370 vehicles.

10.     Each time an ARS employee and/or agent of ARS created a fictitious and/or deceptive account, he or she agreed to abide by the myCARFAX Terms of Use, including but not limited to the following provisions:

    a.  [Y]ou must use a valid email address registered to you.  You may not impersonate any person or entity.

    b.  By creating an account, you represent and warrant to CARFAX that . . . you own the vehicles for which you are using the myCARFAX Service. . . .

    c.  You are hereby granted a limited, revocable, non-exclusive and non-transferable license to access and use the myCARFAX Service in the United States solely for your personal use and only in accordance with these Terms of Use.

d.  You may not . . . make any commercial use of any Service(s). . . .

e.  You SHALL NOT . . . engage in any other practice or activity the purpose
of which is to obtain lists of vehicles, portions of a database or other lists
or information in or from any Services . . . .

f.  Systematic retrieval or use of the Service or any data from the Site to
create or compile, directly or indirectly, in whole or in part, a collection,
compilation, database or directory without the express written permission
of CARFAX is strictly prohibited.

11.     The employees and/or agents of Defendant, in creating myCARFAX accounts,
acknowledge the Terms of Use but do not abide by the Terms, which expressly state that
myCARFAX cannot be exploited for commercial use.

12.     Defendant and its employees and/or agents use these tactics in order to avoid
paying for commercial access to data provided by Carfax in the ordinary course of its business,
and the irony of Defendant's actions is that the very company charged with recovering stolen
vehicles is stealing data to aid in its recovery of those vehicles.

13.     Carfax has suffered significant loss and diminution of product value as a result of
Defendant's wrongful conduct.  Carfax has incurred significant investigation costs in both
money and time, as well as experienced an undue burden on its systems and Information
Technology resources.

**PARTIES**

14.     Plaintiff Carfax is a corporation duly organized and existing under the laws of
Pennsylvania, having its headquarters and principal place of business in Centreville, Virginia.
Carfax is a wholly owned subsidiary of IHS Markit Ltd., based in London, England.

4

15.     Defendant Patrick K. Willis Company, Inc., d/b/a American Recovery Service, is an automobile recovery service provider incorporated in California with its headquarters in Rancho Cordova, California.  One of its primary business activities is locating vehicles for repossession.

## JURISDICTION AND VENUE

16.     The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises out of Defendant's violation of the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030.  The Court has subject matter jurisdiction over Plaintiff's claims under the Virginia Uniform Computer Information Transactions Act, Va. Code § 59.1-501.1, *et seq.*, the Virginia Computer Crimes Act, Va. Code § 18.2 – 152.1, *et seq.*, Breach of Contract, Unjust Enrichment, and Trespass to Chattels pursuant to 28 U.S.C. § 1367.

17.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332, as the amount in controversy is over $75,000 and the parties are incorporated and have their headquarters in different states.

18.     This Court has personal jurisdiction over ARS by virtue of the business activities Defendant conducts within the Commonwealth of Virginia, resulting in sufficient minimum contacts with this forum.  Defendant maintains computers and Internet websites and engages in other conduct availing itself of the privilege of conducting business in Virginia and has utilized instrumentalities located in Virginia to carry out the acts of which Plaintiff complains.

19.     Venue is proper under 28 U.S.C. § 1391(b) in the Eastern District of Virginia because a substantial part of the actions or omissions giving rise to Plaintiff's claims occurred in this judicial district, and because a substantial portion of the property that is the subject of Plaintiff's claims is situated in this judicial district.

20.     Venue is proper under 28 U.S.C. § 1391(c) in the Eastern District of Virginia because Defendant is subject to personal jurisdiction in this judicial district.

21.     Venue and jurisdiction in this Court is also proper because the Defendant is bound by the Terms of Use contractual agreement for myCARFAX, which states "you and CARFAX agree that jurisdiction and venue for all matters relating to these Terms of Use shall be vested exclusively in the state courts in Fairfax County, Virginia, or the U.S. District Court for the Eastern District of Virginia, Alexandria Division."

## FACTUAL BACKGROUND

22.     CARFAX was founded in 1984 for the purpose of collecting odometer readings in order to help car dealers avoid odometer fraud.  Soon after, CARFAX expanded its information collection to include additional vehicle history information and, by 1993, it collected title information from nearly all 50 states.  In subsequent years, CARFAX invested significant resources into building business relationships with data providers to expand upon the data included in its Vehicle History Reports.

23.     Today, Carfax is the leading provider of vehicle history data with over 112,000 data sources and more than 20 billion data records for vehicles in the U.S. and Canada.

24.     The vehicle history data collected, organized, and maintained by Carfax is the company's primary source of value.  Accordingly, it has implemented data security features, terms of use, and legal agreements that all serve to protect Carfax data from being improperly accessed and/or exploited.

25.     Carfax provides multiple different services and products to a wide array of customers ranging from individual consumers to vehicle dealers to banks to insurance companies, among many others.  Carfax's main product is the Vehicle History Report, which draws upon

Carfax's vast database to provide customers with the vehicle history information for a particular vehicle. Each Vehicle History Report contains vehicle information that is reported to Carfax from its sources. Such information may include the vehicle's title information, flood damage history, total loss accident history, odometer readings, number of owners, service history, and accident or damage indicators, among other information.

26.  Individual reports may be purchased by individual consumers for $39.99.

27.  In 2012, Carfax introduced its myCARFAX service specifically designed for individual vehicle owners. Vehicle owners can input their Vehicle Identification Number ("VIN") either on the myCARFAX website or on the myCARFAX mobile app to obtain their vehicle's prior service history reported to CARFAX. Vehicle owners can use myCARFAX to track their vehicle's service history (including oil changes and other routine maintenance), receive automatic service alerts reminding them to perform routine maintenance, and obtain critical information about open safety recalls. Vehicle owners can also use myCARFAX to locate a service provider or provide a rating and review of a service provider's services.

28.  While vehicle owners are not required to pay a fee to use myCARFAX, Carfax derives valuable benefits from vehicle owners who use the service. For example, vehicle owners submit their own data about the vehicle that Carfax may not already have. Owners may also provide ratings and reviews for the service providers they use to service their vehicles which helps to inform other users of myCARFAX of reputable service providers. Vehicle owners that use myCARFAX also send in valuable leads for service shops not currently included in myCARFAX. In addition, Carfax gains a direct and personal connection to a consumer from which it profits by obtaining data and making recommendations for service providers and used car dealers.

29.     A commercial entity, such as a skip tracer like Defendant, that unlawfully uses myCARFAX to access Carfax data that it is not authorized to access, provides no reciprocal benefit to Carfax, as skip tracers do not own the vehicle at issue, do not enter ratings and reviews of service providers, and are not the target of communications from Carfax recommending service providers or used car dealers.  Defendant provides no benefit to Carfax in exchange for its use of myCARFAX or the data obtained from myCARFAX.

30.     The same data provided to vehicle owners as part of the myCARFAX service, including service data, is provided to other customers, including commercial entities, as part of Carfax's other services.  Those services, however, are only available to paying customers and are not provided for free to commercial entities.  For example, a business, such as Defendant, could obtain the service history for a vehicle (and thereby attempt to ascertain the location of the vehicle) by purchasing a Vehicle History Report for the vehicle.

31.     The webpage and initial information screen for myCARFAX are explicit that the product is designed for individual vehicle owners.  It states in large type: "Taking care of **your car** is easier than ever" and "View **your vehicle** history." (Emphases added)

32.    The myCARFAX website also repeatedly uses the phrase "your car" in reference to the product's intended uses:



33.    To use myCARFAX, a person must first register to create a personal account. The registration window notifies registrants that "[b]y creating a FREE account, you agree to the Terms of Use and Privacy Statement."  The phrases "Terms of Use" and "Privacy Statement" are blue hyperlinks that bring the user to a terms of use agreement titled "CARFAX Consumer Terms of Use."  The first page of the agreement, in conspicuous font, states:

> BY VISITING THE SITE, OR ANY PAGE OF THE SITE, AND/OR BY USING ANY CARFAX SERVICE (AS DEFINED BELOW) YOU DEMONSTRATE THAT (I) YOU HAVE READ THESE TERMS OF USE, (II) YOU UNDERSTAND THEM AND (III) **YOU AGREE AND ACKNOWLEDGE THAT THESE TERMS OF USE CONSTITUTE A BINDING CONTRACT BETWEEN YOU AND CARFAX AND YOU WILL COMPLY WITH AND BE BOUND BY THESE TERMS OF USE,** WHETHER OR NOT YOU CREATE A CARFAX ACCOUNT. IF YOU DO NOT AGREE TO THESE TERMS OF USE, PLEASE DO NOT USE THE SITE. IF YOU DO NOT AGREE TO ALL OF THESE TERMS OF USE, YOU MAY NOT CREATE A CARFAX ACCOUNT OR ACCESS OR USE ANY SITE OR ANY PART OF THE CARFAX SERVICE(S).

(Emphasis added)

34.     The Terms of Use also state that "By creating an account, you represent and warrant to CARFAX that (i) you are over the age of eighteen (18) and have the power and authority to enter into and perform the obligations under these Terms of Use, (ii) **you own the vehicles for which you are using the myCARFAX Service** . . ." (emphasis added).

35.     The Terms of Use go on to state:

(a) "The myCARFAX Service is a **personal vehicle** information management service that allows you to consolidate and track information about **your vehicles**." (Emphasis added)

(b) "You are hereby granted a limited, revocable, non-exclusive and non-transferable license to access and use the myCARFAX Service in the United States solely for your **personal use** and only in accordance with these Terms of Use." (Emphasis added)

36.     In addition to expressly restricting the use of myCARFAX to vehicle owners for personal use, the Terms of Use, in a section titled "Restrictions on Access and Use" also explicitly forbid the use of myCARFAX for commercial purposes:

a.  "CARFAX offers you access to the Service(s) solely for your own personal and non-commercial use.  You may not resell or make any commercial use of any Service(s)."

b.  "Except as otherwise expressly permitted under these Terms of Use or copyright law, no copying, redistribution, retransmission, publication or commercial exploitation of Services will be permitted without the express written permission of CARFAX or the copyright owner."

c.  "You SHALL NOT . . . act as a service bureau . . . "

37.     The agreement similarly forbids the systemic retrieval of data and related data compilation activities:

a.   "You SHALL NOT . . . engage in . . . any other practice or activity the purpose of which is to obtain lists of vehicles, portions of a database or other lists or information in or from any Services . . . ."

b.   "Systematic retrieval or use of the Service or any data from the Site to create or compile, directly or indirectly, in whole or in part, a collection, compilation, database or directory without the express written permission of CARFAX is strictly prohibited."

38.     The Terms of Use forbid the user to "use, or allow the use of, any Services in contravention of these Terms of Use or any federal, state, local, foreign or other applicable laws, rules or regulations . . . ."

39.     Defendant has engaged in an ongoing company-wide scheme to avoid paying for Carfax vehicle history data by using the myCARFAX service to unlawfully access vehicle history data for vehicles the Defendant is working to repossess on behalf of lenders and loan holders.  Defendant's employees and/or agents registered for fictitious and/or deceptive personal myCARFAX accounts with their business email addresses and, upon information and belief, may have also used fictitious and/or deceptive email addresses from services like Gmail and Yahoo to circumvent detection, intending to use myCARFAX for commercial purposes.  In so doing, Defendant has violated the myCARFAX Terms of Use to which its employees and/or agents expressly agreed when registering with myCARFAX.

40.     Defendant's employees and/or agents unlawfully use myCARFAX by inputting the VIN (or license plate and state) of a vehicle that they do not own but instead have been

assigned (and are being paid) to help repossess.  The myCARFAX service then accesses

Carfax's proprietary databases to retrieve the vehicle's service history, which provides

Defendant with information that may be used to track the vehicle to a geographic area.

41.     The scope of Defendant's ongoing scheme is extensive.  Over the course of

almost two years, more than 30 employees and/or agents of Defendant have registered multiple

fictitious and/or deceptive profiles and used myCARFAX to unlawfully, and without

authorization, access the data for at least 5,370 different vehicles.  Attached to this Complaint as

**Exhibit A** is a sample of Defendant's unauthorized access into the myCARFAX database,

providing the date and time of each such instance.

42.     At the price of $39.99 each, the total cost of 5,370 Vehicle History Reports would

be $214,746.30.

43.     A small sample of the Defendant's unauthorized usage, shown in Exhibit A,

highlights the egregious nature of the fraud and unauthorized access.  In just one day, one of the

Defendant's employees and/or agents entered 23 VINs over the course of four and a half hours.

This demonstrates a scheme of systemic data collection central to Defendant's commercial

activities.  On any given day, as many as 14 employees and/or agents of Defendant have used the

myCARFAX service to unlawfully access vehicle history data.

44.     The repeated, systemic, and longstanding use of myCARFAX by Defendant's

employees and/or agents establishes that Defendant knew or should have known of the unlawful

use of myCARFAX as a valuable tool for the location of vehicles to be repossessed.

45.     Defendant also knew that the activities of its employees and/or agents were

unlawful for two reasons.  First, since July 2016 Defendant had a commercial contract to

purchase Vehicle History Reports from Carfax.  Second, Defendant purchased a commercial

subscription for Vehicle History Reports *after* Defendant had previously been notified that purchasing VHRs through a personal, consumer account was unauthorized and a violation of the Terms of Use for a consumer account.  One of Defendant's Vice Presidents was notified of this unlawful use on July 13, 2016, and purchased a commercial subscription two weeks later, signing the contract on July 27, 2016.  The commercial contract that Defendant signed on July 27, 2016, was a subscription for the lowest price plan available at the time, with the Vice President noting in her written communication with Carfax that Defendant "want[s] to try and make this a more limited resource due to the cost associated."  But rather than lawfully purchase all of the Carfax data Defendant needed to run its business, Defendant purchased the minimum amount of data from Carfax through a legitimate commercial account while surreptitiously obtaining far more data from myCARFAX without incurring the fees it would otherwise have incurred had Defendant used the commercial account.

46.     On January 11, 2019, Carfax sent a cease and desist letter to Defendant demanding that Defendant terminate its pattern and practice of unauthorized commercial use of myCARFAX data.  A copy of this letter is attached as **Exhibit B**.  The letter stated: "Our records show that rather than pay for Carfax's data, ARS stole the data for at least 5,370 vehicles . . . ."

47.     The repeated, systemic, and longstanding unauthorized use of myCARFAX by Defendant's employees and/or agents was (a) for the benefit of Defendant's business activity of repossessing vehicles and (b) within the scope of the employees' and/or agents' job responsibilities.

48.     Defendant is responsible for the unlawful and unauthorized use by its employees and/or agents acting within the scope of their responsibilities.  Defendant is therefore liable to Carfax pursuant to the doctrine of *respondeat superior*.

49.     In conjunction with its cease and desist letter, Carfax prepared an invoice for the 5,370 instances of unauthorized access uncovered by Carfax's investigation.  Using a reduced rate of only $18.99 per Vehicle History Report, Carfax calculated a total of $101,976.30 owed to Carfax.  This invoice was sent to Defendant with the cease and desist letter on January 11, 2019. A copy of the invoice is attached hereto as **Exhibit C**.

50.     Defendant has refused to pay the invoice and, upon information and belief, has failed to cease its unauthorized access of the myCARFAX database.

51.     By unlawfully accessing and exploiting Carfax's proprietary data, Defendant caused damage to Carfax.  The damage includes, but is not limited to: (1) lost profits from thousands of unlawfully obtained data vehicle profiles, (2) the diminution in value of Carfax's proprietary information, (3) the cost of investigating Defendant's wrongdoing, and (4) an increased burden on Carfax's information technology systems and databases.

52.     Defendant's unlawful conduct gives rise to the following causes of action:

<u>**COUNT I**</u>
**Computer Fraud and Abuse Act (18 U.S.C. § 1030)**

53.     Carfax incorporates the allegations in paragraphs 1 through 52 as if set forth herein.

54.     The Carfax computer systems are a protected computer used in or affecting interstate commerce or communication, and were the same systems accessed by Defendant and its employees and/or agents to view, download, copy, and/or otherwise unlawfully access Carfax's proprietary information.

55.     The protected computer is a high speed data processing device that performs logical, arithmetic, or storage functions, including a data storage facility working in conjunction with the protected computer.

56.     Defendant, through its employees and/or agents, knowingly and intentionally accessed Carfax's protected computer without authorization or in excess of any authorization and thereby obtained information from the protected computer by intentionally viewing, downloading, copying and/or otherwise unlawfully accessing proprietary information in a transaction involving interstate commerce or communication.  18 U.S.C. § 1030(a)(2)(c).

57.     Defendant knowingly and with intent to defraud accessed Carfax's protected computer and database through the myCARFAX service without authorization or in excess of authorization and thereby obtained data of great value used to further the fraud in violation of 18 U.S.C. § 1030(a)(4).

58.     Defendant knowingly and intentionally accessed a protected computer without authorization and, as a result of such conduct, caused damage and loss including, but not limited to: (a) causing Carfax to incur substantial costs, including, but not limited to, the cost of investigating the unauthorized access and conducting a damage assessment, (b) causing Carfax to incur the cost of responding to the unauthorized access, (c) lost revenue to Carfax, (d) imposing undue burdens on Carfax's protected computer systems and databases, and (e) impairing the integrity, unique and proprietary value, and confidentiality of Carfax's proprietary data located on Carfax's protected computer.  18 U.S.C. § 1030(a)(5)(c).

59.     As a result of Defendant's intentional actions, Carfax has sustained aggregate damages and/or losses in excess of $5,000 in value during a one-year period.

60.     Carfax seeks damages under 18 U.S.C. § 1030(g) in an amount to be proven at trial.

61.     As a direct result of Defendant's actions, Carfax has suffered and continues to suffer irreparable harm for which Carfax has no adequate remedy at law, and which will continue unless Defendant's actions are enjoined.

## COUNT II
### Breach of Contract (Common Law and the Virginia Uniform Computer Information Transactions Act, Va. Code § 59.1-501, *et seq.*)

62.     Carfax incorporates the allegations in paragraphs 1 through 61 as if set forth herein.

63.     Use of the myCARFAX product is governed by and subject to the contractual obligations in the Terms of Use.  By registering for a myCARFAX account, a user agrees to the Terms of Use and its contractual obligations.  The Terms of Use and the requirement that a user agree therewith are both conspicuous and prominently placed.  The Terms of Use may be printed or stored for archival or review purposes.  A reasonable person accessing myCARFAX would have a reasonable and objective understanding that he or she was entering a contract by accepting the benefits of using myCARFAX.

64.     Defendant and its employees and/or agents had the opportunity to review the Terms of Use pursuant to Va. Code §§ 59.1-501.13:1.

65.     Defendant and its employees and/or agents have repeatedly and systemically created myCARFAX accounts to access myCARFAX data and therefore manifested assent and agreement to the Terms of Use under the Virginia Uniform Computer Information Transactions Act ("UCITA"), Va. Code § 59.1-501.1, *et seq.*, and under the common law.

66.     Upon information and belief, by taking steps to evade detection and myCARFAX's use limitations, Defendant and its employees and/or agents have betrayed their

knowledge of those limitations and the fact that the myCARFAX Terms of Use bar the commercial use of myCARFAX and its data.

67.     The Terms of Use impose legally enforceable obligations upon and are binding on Defendant and its employees and/or agents.

68.     Defendant has, as described above, willfully, repeatedly, and systemically breached the Terms of Use and its associated obligations.

69.     Carfax has performed all conditions, covenants, and promises required of it in accordance with the Terms of Use.

70.     Defendant's breach of the Terms of Use has damaged Carfax, causing and continuing to cause harm and damage to Carfax.

71.     Carfax is entitled to damages as a result of Defendant's breach of the Terms of Use.

72.     As a direct result of Defendant's actions, Carfax has suffered and continues to suffer irreparable harm for which Carfax has no adequate remedy at law, and which will continue unless Defendant's actions are enjoined.

## COUNT III
### Computer Fraud and Computer Trespass (Virginia Computer Crimes Act, Va. Code § 18.2 – 152.1, *et seq*.)

73.     Carfax incorporates the allegations in paragraphs 1 through 72 as if set forth herein.

74.     In connection with its regular business operations, including the provision of online and internet-based services to consumers in Virginia and other states, Carfax maintains in Virginia computers and computer networks that are "property" within the meaning of Va. Code § 18.2-152.2.

75.     Without authority, Defendant has repeatedly, systemically, and with malicious intent gained unauthorized access to Carfax's computer systems and data with the intent to obtain property and services under false pretenses by creating fictitious and/or deceptive myCARFAX accounts.

76.     Without authority, Defendant has repeatedly, systemically, and with malicious intent gained unauthorized access to Carfax's computer systems and data in order to use Carfax's computers and computer network to make or cause to be made an unauthorized copy of Carfax's vehicle history data residing in, communicated by, and produced by Carfax's computer systems.

77.     The foregoing acts of Defendant have caused injury and damage to Carfax, Carfax's computer networks, and Carfax's reputation, including lost revenue.

78.     As a direct result of Defendant's actions, Carfax has suffered and continues to suffer irreparable harm for which Carfax has no adequate remedy at law, and which will continue unless Defendant's actions are enjoined.

**COUNT IV**
**(Alternative to Count II)**
**Unjust Enrichment**

79.     Carfax incorporates the allegations in paragraphs 1 through 78 as if set forth herein.

80.     Plaintiff asserts the following alternative common law tort claims of unjust enrichment (Count IV) and trespass to chattels (Count V), pursuant to Va. Code § 8.01-272.

81.     Defendant has derived benefit, including commercial advantage and private financial gain, from its willful and unauthorized access, use, and copying of CARFAX's proprietary data.

82.     Defendant had an appreciation and knowledge of the benefit it derived from its unauthorized access, use, and copying of Carfax's proprietary data, as well as the activities alleged herein.

83.     Defendant previously purchased Carfax vehicle history data and was aware of its value, particularly within the automotive and repossession industries.  Skip tracers like Defendant routinely purchase vehicle history data from Carfax.  The repeated unauthorized access by Defendant also demonstrates the great value that Carfax vehicle history data has for Defendant.

84.     Defendant has accepted and retained the benefits of its unauthorized access, use, and copying of Carfax's proprietary data under circumstances which render it inequitable for Defendant to retain those benefits without payment to Carfax.

85.     As a result of the conduct set forth above, Defendant has been unjustly enriched by the receipt and appreciation of benefits resulting from the unauthorized access.

86.     Defendant's unauthorized access, use, and copying of Carfax's proprietary data have damaged Carfax in an amount to be proven at trial, and Defendant should disgorge its ill-gotten profits.

87.     As a direct result of Defendant's actions, Carfax has suffered and continues to suffer irreparable harm for which Carfax has no adequate remedy at law, and which will continue unless Defendant's actions are enjoined.

### COUNT V
**Trespass to Chattels**

88.     Carfax incorporates the allegations in paragraphs 1 through 87 as if set forth herein.

89.     Defendant repeatedly, systemically, and intentionally gained unauthorized access to Carfax's proprietary data by creating fictitious and/or deceptive myCARFAX accounts.  In so doing, Defendant and its employees and/or agents engaged in an improper intrusion into Carfax's computer systems and databases without the authorization of Carfax.

90.     Defendant's acts of trespass have been undertaken intentionally with malice, oppression and fraud, justifying the imposition of punitive damages in an amount sufficient to punish Defendant and deter Defendant and others from engaging in similar conduct.

91.     Defendant's intentional use of and intermeddling with Carfax's proprietary data through myCARFAX impaired the value of the proprietary information and allowed Defendant to improperly exploit the information for pecuniary gain.  Defendant's actions diminished the value of Carfax's possessory interest in its computer systems and data.

92.     Defendant's actions have caused injury to Carfax and imposed costs on Carfax including time, money, reputation, and a burden on Carfax's computer systems.  As a result of Defendant's unauthorized and intentional conduct, Carfax has been damaged in an amount to be proven at trial.

93.     As a direct result of Defendant's actions, Carfax has suffered and continues to suffer irreparable harm for which Carfax has no adequate remedy at law, and which will continue unless Defendant's actions are enjoined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks the following relief:

1.     An injunction barring Defendant and its officers, directors, principals, servants, employees and/or agents, successors, and assigns, and all persons and entities in

active concert or participation with them, from accessing Carfax data through the myCARFAX service.

2.      Judgment in favor of Carfax and against Defendant.

3.      A declaration that Defendant's conduct has been willful, intentional, and that Defendant acted with oppression, fraud and malice.

4.      Damages adequate to compensate Carfax for Defendant's activity complained of herein and for any injury complained of herein, including but not limited to interest and costs, in an amount to be proven at trial.

5.      Disgorgement damages requiring the turnover of any revenues earned through the misappropriation of Carfax's proprietary data.

6.      Punitive damages in an amount sufficient to punish Defendant and deter Defendant and others from engaging in similar conduct.

7.      Attorney's fees, costs, and expenses, including those allowed under Section 17 of the Terms of Use agreed to by Defendant.

8.      Such other relief as the Court deems just and reasonable.

Dated: October 10, 2019                          Respectfully submitted,

CARFAX, INC.


_/s/_____
Sarah W. Sigurdson (Va. Bar No. 94479)
Carfax, Inc.
5860 Trinity Pkwy., Suite 600
Centreville, VA 20120
Telephone: (703) 934-2664
Facsimile: (703) 995-4664
E-mail: SarahSigurdson@carfax.com

Counsel for Plaintiff